The **MUSCOGEE (CREEK) NATION**, Plaintiff,

v.

**Donald HODEL, Secretary of the Interior, Defendant.**

Civ. A. No. 85–2668.

United States District Court, District of Columbia.

Sept. 30, 1987.

Nancy G. Dunn, Washington, D.C., Geoffrey M. Standing Bear, Tulsa, Okl., George Almerigi, General Counsel, Muscogee (Creek) Nation, Okmulgee, Okl., for plaintiff.

Pamela S. West, Trial Atty., U.S. Dept. of Justice, Land & Natural Resources Div., General Litigation Section, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

In *Harjo v. Kleppe*, 420 F.Supp. 1110 (D.D.C.1976), *aff'd sub nom. Harjo v. Andrus*, 581 F.2d 949 (D.C.Cir.1978), this Court extensively reviewed the history of the federal government's relations with the Muscogee (Creek) Nation, an Indian tribe located in the state of Oklahoma, and concluded that

> despite the general intentions of the Congress of the late nineteenth and early twentieth centuries to ultimately terminate the tribal government of the Creeks, and despite an elaborate statutory scheme implementing numerous intermediate steps toward that end, the final dissolution of the Creek tribal government created by the Creek Constitution of 1867 was never statutorily accomplished, and indeed that government was instead explicitly perpetuated.

420 F.Supp. at 1118. Accordingly, the court determined that the Secretary of the Interior and other federal officials had acted illegally in recognizing the Principal Chief of the Creeks as the sole embodiment of their Nation. *Id.* at 1142. In order to ensure that the tribe could effectively assert its right to democratic self-government in the future, the court created a five member commission to supervise the reorganization of the Creek government under a new constitution. *Id.* at 1143–47. Following the decision in *Harjo*, the Muscogee Nation held an election at which a majority of the tribe's voting members ratified a new constitution. This constitution was approved by the Secretary of the Interior on August 17, 1979.

The Muscogee constitution provides for a tripartite government containing executive, legislative and judicial branches. Article VII, Section 1 of the constitution provides that

> The judicial power of the Muscogee (Creek) Nation shall be vested in one

Supreme Court limited to matters of The Muscogee (Creek) Nation's jurisdiction and in such inferior courts as the National Council may from time to time ordain.

In 1982, the Muscogees adopted a judicial code establishing a tribal court system with general civil and criminal jurisdiction over tribally enrolled citizens of the Nation. *See* Administrative Record ("AR"), Exhibit 3, Document 4. The present dispute arose when the tribe applied to the Bureau of Indian Affairs for funding for their courts and law enforcement agency. On April 6, 1983, the Bureau denied the request for funding on the ground that the tribe was precluded from exercising either civil or criminal jurisdiction by virtue of the Curtis Act of 1898. Act of June 28, 1898, ch. 517, 30 Stat. 495. *See* AR, Exhibit 3, Documents 7 & 8. This decision was appealed by the Muscogees on May 12, 1983 and was affirmed by the Interior Board of Indian Appeals ("the Board") on July 22, 1985. The Board's decision addressed the following legal questions:

> Did Congress deprive the Creek Nation of general civil and criminal judicial authority, and, if so, has such authority been returned to the tribe?

13 IBIA 211, 219 (1985). The Board concluded that "the Nation's civil and criminal judicial authority was abolished by acts of Congress and has not been restored." *Id.* at 220.

This action for declaratory and injunctive relief was filed on August 21, 1985. Although plaintiff's complaint states eight separate claims for relief, plaintiff's more recent pleadings appear to acquiesce in defendant's contention that this is an action for judicial review of the Board's decision pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, *et seq. See* Response in Support of Plaintiff's Motion for Summary Judgment and In Opposition to Defendant's Motion for Summary Judgment at 3. This Court has jurisdiction over this action by virtue of 5 U.S.C. § 702.[1] Review is limited to determining whether

the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). Generally speaking, agency action is entitled to considerable deference, especially when the action at issue involves the construction of a statute which specifically affects the agency. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This rule of deference is grounded in the recognition that the agency usually has considerable expertise in the controversies placed before it. When, however, an agency is asked to determine the scope and meaning of several acts of Congress which are separate from the statute under which the agency itself is established or which the agency is charged with administering, the case for deference is weakened. *See Hi-Craft Clothing Co. v. NLRB,* 660 F.2d 910, 914 (3d Cir.1981). In this case, both the agency and the court are called upon to answer the "narrow legal questions," *see* 13 IBIA at 219, whose resolution depends upon the interpretation of several acts of Congress. There is no reason to believe that the agency will be in a better position than the court to consider the relevant legislative history and to apply the appropriate rules of statutory construction. The opinion of the Indian Bureau of Appeals concerning these questions is entitled to careful consideration. But that opinion cannot survive a judicial determination based on an independent examination of the record that the Board's decision is not "in accordance with law." 5 U.S.C. § 706. *See I.N.S. v. Cardoza-Fonseca,* ── U.S. ──, 107 S.Ct. 1207, 1220–21, 94 L.Ed. 2d 434 (1987).

## I.

The case is currently before the Court on cross motions for summary judgment. There are no material facts in dispute. In order to determine whether the Board's decision not to fund the Muscogee court system was or was "not in accordance with

---

1. That statute provides, in part, that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

law," it is necessary to examine briefly the history of the federal government's relations with the Creek Nation.[2]

When European settlers arrived in America, the Creek Nation occupied a large territory in the present states of Georgia, Alabama and Florida. From time to time over more than a century, beginning in 1707, the tribe was forced to cede portions of its territory to Great Britain, to the American colonies, and ultimately to the United States. Finally, in 1832, the portion of the Creek Nation of which plaintiff is a part ceded all lands east of the Mississippi River and moved to an area in the present state of Oklahoma. Because of their cultural and political sophistication, the Creeks and four other Indian Tribes who were removed to Oklahoma became known as the Five Civilized Tribes. See 420 F.Supp. at 1119.

The Creek Removal Treaty of March 24, 1832, which formalized this move, guaranteed the Creek Nation the right to perpetual self-government. 7 Stat. 366. While two later treaties continued to erode the boundaries of the Creek Nation at its Oklahoma site, both treaties reaffirmed the groups' right to self government. See Treaty with Creeks and Seminoles of August 7, 1856, 11 Stat. 699; Treaty with the Creeks of June 14, 1866, 14 Stat. 785.[3] In 1867, the Creek Nation established a constitutional form of government which included a separation of powers into executive, legislative and judicial branches. Judge Bryant previously described the Creek court system established by this constitution in the following terms:

> The constitution also created a court system, whose jurisdiction was limited to Creek citizens. The nation was divided into six districts; each had a judge elected by the Council. The district court tried all criminal cases and minor civil cases and trial by jury was provided.

There was a Supreme Court of five justices chosen by the Council for four year terms, which tried all civil cases where the amount in controversy exceeded one hundred dollars.

420 F.Supp. at 1120.

In the last few decades of the nineteenth century, the Creek Nation faced a number of problems which were caused by a dramatic increase in the number of white settlers living illegally in the Indian Territory. The white settlers sought an end to the traditional Creek system of land ownership which provided that all land was held by the tribe communally and reverted to the nation upon the death of a member who was cultivating it. See id. at 1121. Indeed, expansion in the entire western area of the United States lead to pressure in Congress for a new Indian land policy called "allotment." See generally Felix S. Cohen, Handbook of Federal Indian Law 127–144 (1982). Under the allotment system, individual members of the tribe were given separate plots of land which were transferrable to non-members. Proponents of allotment argued that individual plots would be a more efficient means of agriculture and would therefore provide surplus land for white settlers. See id. at 128. Allotment was also justified as a means of assimilating Indians into white culture. Id. at 128–29. In response to this pressure, Congress passed the General Allotment Act of February 8, 1887, Ch. 119, 24 Stat. 388 (as amended and codified at 25 U.S.C. §§ 331–334, 339, 341, 342, 348, 349, 354, 381). However, the five Civilized Tribes, including the Creek Nation, were excluded from the application of this Act. See id. at § 8; 24 Stat. 391 (codified at 25 U.S.C. § 339).

The increasing number of white settlers also presented problems for the Creek courts in the late nineteenth century. The

---

**2.** The following description of the history of the Creek Nation as it relates to the issues before the Court relies heavily on the defendant's Statement of Material Facts which has been adopted by the plaintiff, and on the opinion of Judge Bryant in *Harjo v. Kleppe, supra.* The *Harjo* decision cited extensively to A. Debo, *And Still The Waters Run* (Gordian Press, Inc., 1966), and

A. Debo, *The Road to Disappearance* (Univ. of Oklahoma Press, 1941).

**3.** The 1866 treaty ceded to the United States the western half of the Indian domain as a penalty for the tribe's alliance with the Confederacy during the Civil War. *See* 420 F.Supp. at 1119–20.

fact that the Creek court system had no jurisdiction over white settlers meant that "[c]rime flourished, the payments of debts was unenforceable." 420 F.Supp. at 1121. In response to this breakdown in judicial effectiveness, Congress created a special federal court with exclusive jurisdiction over all federal criminal offenses committed within the Indian Territory not punishable by death or by imprisonment at hard labor, and over certain civil cases. Act of March 1, 1889, Ch. 333, 25 Stat. 783. However, the Act provided no civil jurisdiction over controversies "between persons of Indian blood only," *id.* at § 6, 25 Stat. 784, and made most of the statutes enumerating federal crimes inapplicable to "offenses committed by an Indian upon the person or property of another Indian," *id.* at § 27, 25 Stat. 788. One year later, in May of 1890, Congress created the Oklahoma Territory out of the western portion of the Indian Territory and established a new territorial government. Act of May 2, 1890, Ch. 182, 26 Stat. 81. At the same time, Congress terminated the jurisdiction of the Special United States Court in the Oklahoma Territory, *id.* at § 29, 26 Stat. 93, but broadened its jurisdiction in the remaining area of the Indian Territory to all civil cases except cases over which the tribal courts had exclusive jurisdiction and to all contract cases to which an Indian was a party. *Id.*

At the same time that it was acting to create a parallel court system in the diminished Indian Territory, Congress moved to enforce the now prevailing policy of allotment of tribal lands. In 1893, Congress created the Dawes Commission and delegated to it the responsibility for negotiating allotment agreements with the five civilized tribes in the Oklahoma area. Act of March 3, 1893, Ch. 209, 27 Stat. 612. This Commission was unsuccessful over the next few years in reaching voluntary allotment agreements with the members of the five tribes. *See* 420 F.Supp. at 1122. The resistence of the Creeks to the allotment policy was summarized by Chief Ispathecher who stated

I think it far better for us to stand firm by the treaties we have, and plead the justice of our cause by all lawful and honorable means, than enter into this agreement. I fail to see any betterment of our condition by this agreement, but to the contrary, I can see much that will be to our detriment.

Resolution of the Creek National Council, October 18, 1897, S. Doc. No. 34, 55th Cong., 2nd Sess. (1897) at 11–12. As a result of the tribes' refusal to negotiate with the Dawes Commission, pressure mounted in Congress for the forcible abolition of tribal status. 420 F.Supp. at 1122.

The Indian Department Appropriations Act of 1897 contained several provisions which were designed to induce the individual tribes to negotiate with the Dawes Commission. For example, the Act required that after January 1, 1898, all laws passed by the National Councils of the five civilized tribes would be subject to Presidential veto except "resolutions for adjournment," or any acts relating to negotiations with the Dawes Commission. 30 Stat. at 84. More importantly, the Act expanded the jurisdiction of the Territorial United States Court to all civil cases and all criminal cases arising after January 1, 1898, but provided that any agreement between the Dawes Commission and one of the tribes would "operate to suspend any provisions of this Act if in conflict therewith as to said Nation." 30 Stat. at 83–84.

Finally, on June 28, 1898, Congress passed the Curtis Act which provided for forced allotment and eventual termination of the tribal tenure unless the tribes ratified the outstanding proposed allotment agreement. Act of June 28, 1898, ch. 517, 30 Stat. 495; *see* 420 F.Supp. at 1122. The Act forebade the enforcement of tribal law in the Special United States Court in the Indian Territory and pronounced that effective July 1, 1898 "all tribal courts in Indian Territory shall be abolished, and no officer of said courts shall thereafter have any authority whatever to do or perform any act theretofore authorized by any law in connection with said courts, or to receive any pay for same." 30 Stat. 505.

As an inducement to the adoption of an allotment agreement, Congress delayed until October 1, 1898, the implementation of

the provision abolishing tribal courts for the Chickasaw, Choctaw, and Creek tribes. Under the pressure of the Curtis Act, the Creeks entered into an allotment agreement with the Commission which provided for the reorganization of the Creek courts. *See* Creek Agreement of February 1, 1899, House Doc. No. 252, 55th Cong., 3d Sess. (1899) at 8. However, Commissioner Dawes refused to sign this agreement, *id.* at 13, and the agreement that was eventually ratified by Congress on March 1, 1901 specifically provided that "Nothing contained in this agreement shall be construed to revive or reestablish the Creek courts which have been abolished by former Acts of Congress." Act of March 1, 1901, ch. 676, 31 Stat. 861, 873. The provisions of this Allotment Act were ratified by the Creek National Council on May 25, 1901 and proclaimed by President William McKinley on June 25, 1901. AR, Exhibit 27, 13 IBIA 218. Although this act provided that the tribal government of the Creek Nation should not continue after March 4, 1906, Congress provided five years later for the continuing existence of limited tribal governments with the Five Tribes, but made no provision for a tribal court system. Act of April 26, 1906, ch. 1876, 34 Stat. 137.[4]

During the administration of President Franklin D. Roosevelt, the policy of allotment came under criticism and Congress moved to preserve and restore traditional Indian forms of land ownership and organization. *See generally* Cohen, *supra*, at 144–47. The cornerstone of the new federal policy was the Indian Reorganization Act ("IRA" or "1934 Act") which was passed by Congress in 1934. Act of June 18, 1934, ch. 576, 48 Stat. 984 (as amended and codified at 25 U.S.C. §§ 461, 462, 463, 464, 465, 466–70, 471–73, 474, 475, 476–78, 479). The IRA embodied a comprehensive plan to improve the economic status of Indians and to strengthen the self-government of the remaining tribes while decreasing the influence of the Department of the Interior over tribal affairs. In order to achieve these

goals, the IRA made the alienation of Indian lands more difficult, provided for acquisition of land for the landless, vested tribes with political authority, established a system of financial credit, provided funds for college and technical training and helped Indians gain jobs on the reservations. *See* 78 Cong.Rec. at 11123 (Remarks of Senator Wheeler).

Due to the intervention of Senator Thomas of Oklahoma, however, all of the Oklahoma Indians were excluded from the provisions of the 1934 Act. *See* 25 U.S.C. § 473. Senator Thomas argued that the philosophy behind the Indian Reorganization Act did not apply in Oklahoma where the Indians were relatively assimilated into the culture of the state. In addition, Senator Thomas was apparently concerned that the 1934 Act would decrease state property tax revenues. *See* 78 Cong.Rec. at 11126 (Remarks of Senator Thomas).

Two years later, however, Congress passed the Oklahoma Indian Welfare Act ("OIWA" or "1936 Act") which granted to the Indians of Oklahoma many of the benefits extended to other tribes by the Indian Reorganization Act. Act of June 26, 1936, ch. 831, 49 Stat. 1967 (codified at 25 U.S.C. § 501–09). Section 3 of this Act specifically provides that "[a]ny recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secretary of the Interior may prescribe." 25 U.S.C. § 503. When the Muscogee Nation reorganized its government following the decision in *Harjo*, it adopted its constitution in accordance with this statutory authorization and received the approval of the Secretary of the Interior. However, that approval expressly stated that "nothing in this approval shall be construed as authorizing any action under the constitution that would be contrary to federal law." *See* AR, Exhibit 3, Document 2.

---

**4.** For an analysis of this Act and its effect on the political organization of the Creek Tribe, *see*

*Harjo,* 420 F.Supp. at 1126–30.

## II.

Plaintiff has advanced two arguments why the Muscogee Nation retains its inherent civil and criminal jurisdiction despite the provisions of the 1898 Appropriations Act, the Curtis Act and the Act of March 1, 1901.[5] First, plaintiff argues that these statutes were not intended to extinguish forever the tribe's power to exercise judicial authority over tribal members. Second, plaintiff argues that the Oklahoma Indian Welfare Act repealed any prior acts which interfered with its right to maintain a tribal court system. These arguments will be considered in turn below.

■ It is one of the essential principles of Indian law that unless abrogated by a contrary law, Indian tribes possess inherent powers of sovereign nations including the right to self-government. *See United States v. Wheeler*, 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1085–86, 55 L.Ed.2d 303 (1978). Included within this right to self-government is the right to enforce the criminal and civil laws of the tribe. *See id.* at 322–26, 98 S.Ct. at 1085–87. Moreover, it is undisputed that the early treaties between the Creek Nation and the federal government explicitly provided for continuation of the Creek's tribal government. *See, e.g.*, Creek Treaty of March 24, 1832, 7 Stat. 366, 368. For example, the 1856 Treaty provided, in part, that "the Creeks ... shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their respective limits." Treaty with Creeks and Seminoles, 11 Stat. 699, 703–04.

Nonetheless, the undisputed evidence also shows that the federal government did not fully honor these promises to the Creek Nation; instead, in the late nineteenth and early twentieth century, Congress encroached significantly upon the tribe's inherent and treaty-based rights to self government in an effort to advance the prevailing policy of assimilation. And while the policy and the means by which it was advanced may be questioned today, there can be no question that Congress possessed the plenary power to alter or suspend the provisions of earlier treaties by duly enacted legislation. *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 566–68, 23 S.Ct. 216, 221–22, 47 L.Ed. 299 (1903); *Blake v. Arnett*, 663 F.2d 906, 910 (9th Cir.1981); *Rosebud Sioux Tribe v. Kneip* 521 F.2d 87, 98 (8th Cir.1975), *aff'd*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Unlike the Constitution, acts of Congress which conflict with contemporary policy preferences can be changed by Congress.

While it does not explicitly argue that Congress lacked the power to abrogate the early treaties when it enacted the Curtis Act and the related legislation, plaintiff argues that Congress' intent to abandon those treaties was not expressed with sufficient clarity. *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 412–13, 88 S.Ct. 1705, 1710–11, 20 L.Ed.2d 697 (1968). But the provision of the Curtis Act which abolished the Creek tribal courts was unambiguous. As noted above that statute states that "all tribal courts in Indian territory shall be abolished." Under these circumstances, "[t]he intent to abrogate inconsistent treaty rights is clear enough from the express terms of [the Act]."

---

**5.** Plaintiff has also argued in its brief that the Curtis Act is an "unlawful bill of attainder." There is good reason to believe that this constitutional challenge to an Act of Congress over eighty years after its enactment has not been raised in a timely fashion and is therefore not properly before the Court. Moreover, the legislative history demonstrates that the abolition of the Creek courts was not accomplished solely for a punitive purpose but rather was part of a comprehensive plan designed to further the prevailing policy of assimilation. *See infra* at 441. In light of Congress' plenary power over Indian affairs, laws implementing this policy were not beyond the Congress' legislative authority.

Plaintiff also suggests that "[t]he victory in *Harjo* should control the outcome of this litigation under the doctrine of *res judicata.*" Memorandum in Support of Plaintiff's Motion for Summary Judgment at 2. This suggestion must be rejected; the opinion in *Harjo* dealt solely with the political organization of the tribe, and more specifically, with the power of the Creek National Council to authorize the allocation of tribal funds; it did not speak to the vitality of the Creek tribal courts, or the reality or vitality of the Acts of Congress which abolished them.

*Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 478 n. 22, 99 S.Ct. 740, 750 n. 22, 58 L.Ed.2d 740 (1979). And while the statute itself does not refer to the earlier treaties with the Creeks, the legislative history of the Act demonstrates that Congress was well aware of the conflict with these treaties. *See* 31 Cong.Rec. 5593 (1898) (remarks of Senator Bate) (noting that the Curtis Act "sweeps all the laws of the Indians away, all their courts of justice, all their juries, all their local officers, and all the rights they have under the treaties they have been given and guaranteed by the government of the United States.")

Plaintiff argues with some force that this provision of the Curtis Act and the related provisions of the 1898 Appropriations Act was intended to force the Creeks to enter into an Allotment Agreement. The record of the Senate debates demonstrate that the Congress was aware that these provisions might encourage the tribes to negotiate allotment agreements which retained the tribal courts.[6] For example, Senator Berry, a supporter of the 1898 Appropriations bill, noted

> As I said before, if this provision is retained in regard to the courts, I have no doubt but what within six months or a year treaties will be made in regard to allotments and all the rights of the Indians will be protected; but if the legislation be defeated, the Senator will find that there will be no agreement of any kind with the Dawes Commission. If the Senate desire a suitable settlement of this matter, to which both sides agree, it will keep this provision in the bill in regard to the abolition of the Indian courts ...

29 Cong.Rec. 2324 (1897) (remarks of Senator Berry); *see also* 31 Cong.Rec. 5588 (remarks of Mr. Jones). Nonetheless, no agreement was reached before the October 1, 1898 deadline imposed by the Curtis Act. Moreover, the agreement which was eventually ratified by Congress in March of 1901 explicitly reiterated that the tribal courts had been abolished and were not revived by the Act. Act of March 1, 1901, ch. 676, 31 Stat. 861, 873. While the abolition of the tribal courts was, in part, "a bludgeon with which to brain the Indian," *see* 29 Cong.Rec. 2310 (1897) (remarks of Senator Bate), it was also part of a comprehensive plan to assimilate Indians into white culture. Thus, having finally won the allotment treaty, Congress refused to return the tribal courts. As Commissioner Dawes stated when he rejected an agreement that sought to restore the tribal courts,

> the presence of the old courts with any jurisdiction and with all the scandals attached to them seems to me an unnecessary step backward.... I feel that it is the duty of the Government to keep its face steadily to the future and take no step backward.

House Doc. No. 252, 55th Cong., 3d Sess. (1899) at 13. It is therefore clear that Congress knowingly and intentionally altered the provisions of the earlier treaties and explicitly abolished the traditional tribal courts of the Creek Nation.

The history of the Creek Nation did not end, however, with the ratification of the allotment treaty in 1901. For the purposes of this dispute, the most significant development came in 1936 with the passage of the Oklahoma Indian Welfare Act. As was discussed above, this act was intended to extend to the Indian tribes of Oklahoma many of the benefits provided to non-Oklahoma tribes by the Indian Reorganization Act of 1934. The main provisions of the OIWA establish a plan to purchase land for Oklahoma Indians who had lost their property through the allotment process. *See* 25 U.S.C. §§ 501–02. In addition, the Act allowed Indians to organize for both political and economic purposes. Section 3 of the Act provided as follows:

> Any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws, under such rules and regulations as the Secre-

---

**6.** Indeed, the Seminole tribe did negotiate an allotment agreement which expressly preserved the jurisdiction of its tribal courts. *See* Act of July 1, 1898, ch. 542, 30 Stat. 567, 569.

tary of the Interior may prescribe. The Secretary of the Interior may issue to any such organization a charter of incorporation, which shall become operative when ratified by a majority vote of the adult members of the organization voting: *Provided, however,* That such election shall be void unless the total vote cast be at least 30 per centum of those entitled to vote. Such charter may convey to the incorporated group, in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma, the right to participate in the revolving credit fund and to enjoy any other rights or privileges secured to an organized Indian tribe under the Act of June 18, 1934 (48 Stat. 984) [the Indian Reorganization Act]; *Provided,* That the corporate funds of any such chartered group may be deposited in any national bank within the State of Oklahoma or otherwise invested, utilized, or disbursed in accordance with the terms of the corporate charter.

25 U.S.C. § 503 (emphasis in original). Section 9 of the OIWA provides, in part, that "[a]ll Acts or parts of Acts inconsistent herewith are hereby repealed." 25 U.S.C. § 509.

█ Plaintiff contends that, in light of the repealer clause of § 9, this Act should be construed to repeal the earlier legislation that outlawed the Muscogee courts. In order to determine whether the OIWA revived the traditional Creek courts, it is necessary to determine what powers that Act provided for tribes that organized under its provisions. The Act specifies that tribes may adopt a constitution and that any tribe which has done so may apply to the Secretary of the Interior for a "charter of incorporation." [7] Unlike the IRA of 1934, the OIWA of 1936 does not specifically ennumerate the powers which may be vested in a tribe by a constitution adopted pursuant to its provisions. It might therefore be argued that a tribal constitution

adopted pursuant to the OIWA may convey all the usual attributes of constitutional government, including the power to create a judicial branch, regardless of whether the tribe retained these powers under "existing law" in 1936.

However, both parties to this suit have maintained that the OIWA was intended to convey to the Indians of Oklahoma the same rights conveyed to other tribes by virtue of the IRA. *See, e.g.,* Plaintiff's Supplemental Memorandum in Response to the Court's December 23, 1986 Notice to Counsel at 3; Defendant's Supplemental Memorandum in Response to the Court's December 23, 1986 Notice to Counsel at 7–8. This interpretation of the OIWA is amply supported by the legislative history. *See, e.g.,* H.R.Rep. No. 2408, 74th Cong., 2d Sess. 3 (1936) (stating that the OIWA "will permit the Indians of Oklahoma to exercise substantially the same rights and privileges as those granted to Indians outside of Oklahoma by the Indian Reorganization Act of June 18, 1934"). The IRA provides that a constitution adopted by a tribe shall vest in the tribe "all powers vested in any Indian tribe or tribal counsel *by existing law*" and well as certain other powers which are not relevant here. 25 U.S.C. § 476 (emphasis added). It would be anomalous to hold that the OIWA conveyed to the Indians of Oklahoma greater powers of self-government than the IRA granted to other tribes in view of the fact that the Oklahoma Indians were excluded from the 1934 Act because "the Oklahoma Indians having made progress beyond the reservation plan, it was thought best not to encourage a return to reservation life." *See* S.Rep. No. 1232, 74th Cong., 1st Sess. 6 (1935). Finally, the OIWA does specify that any tribe which receives a charter of incorporation may exercise, "in addition to any powers which may properly be vested in a body corporate under the laws of the State of Oklahoma," [8] the right to "enjoy

---

7. For a description of the differences between tribal constitutions and charters of incorporation, *see S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community,* 138 Ariz. 378, 674 P.2d 1376, 1371–82 (App.1983).

8. It might be argued that the term "body corporate" refers to municipal corporations and that the Muscogees would be entitled to create a "Municipal Court" under Okla.Stat., tit. 11, § 27–101 if they were to apply for a charter of

any other rights or privileges secured to an organized Indian tribe under [the provisions of the IRA]." 25 U.S.C. § 503. Since this provision refers to the entire IRA, and not solely to those portions that relate to incorporated associations, Congress must have intended thereby to delineate the powers which could be exercised under a tribal constitution as well as the powers which could be conferred by a charter of incorporation.

Once it is assumed that the OIWA conferred the same governmental powers as the IRA, it follows that that Act could not have been intended to revive tribal court systems which had been abolished by Act of Congress. The explicit reference to "existing law" in the IRA makes it unmistakably clear that while the Congress intended to effect a reorganization of existing tribes, it did not intend to reestablish all of the elements of tribal sovereignty that had been abridged by prior legislative action. *Cf. United States v. Wheeler*, 435 U.S. at 328, 98 S.Ct. at 1088 (holding that the IRA did not "*creat[e] the Indians' power to govern themselves and their right to punish crimes committed by tribal offenders.* Indeed the [IRA] ... recognized that Indian tribes already had such power under "existing law.") (emphasis in original). Of course, Congress did vest the reorganized tribes with certain specified powers (such as the power to employ legal counsel) which may have been abolished for some of the tribes by 1934. As to these limited powers, the 1934 Act did repeal earlier legislation. But the jurisdiction of the Indian Courts has been a matter of such importance in the history of federal relations with the Indian tribes that it is not likely that Congress would have failed to include this power within the list of rights granted to reorganized tribes if it had intended to revive the abolished courts.

Under traditional canons of statutory interpretation, it is clear that the general repealer clause contained in § 9 of the OIWA cannot be construed to revoke the abolition of the Creek's tribal courts.

However, plaintiff notes that the Supreme Court has recently reemphasized that "standard principles of statutory construction do not have their usual force in cases involving Indian law." *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). Instead, "statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit." *Id.* Plaintiff urges the Court to consider the effect of the OIWA in light of the Supreme Court's reminder that courts " 'are not obligated in ambiguous instances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship.' " *Bryan v. Itasca County*, 426 U.S. 373, 388 n. 14, 96 S.Ct. 2102, 2111 n. 14, 48 L.Ed.2d 710 (1976) (quoting *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 663 (9th Cir.1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977)).

In *Montana v. Blackfeet*, the Court relied, in part, on a similar general repealer clause in the Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396a, *et seq.*, in declining to apply a 1924 Act which authorized taxation of Indian property. The 1924 Act provided that "the production of oil and gas and other minerals on such lands may be taxed by the states in which said lands are located." 471 U.S. at 763, 105 S.Ct. at 2402. The Indian Mineral Leasing Act of 1938, a comprehensive act designed to obtain uniformity in the leasing of tribal lands for mining purposes, did not authorize or forbid state taxation but did contain a general repealer provision. The Court found in that case that there was no "indication that Congress intended to incorporate implicitly in the 1938 Act the taxing authority of the 1924 Act." *Id.* at 767, 105 S.Ct. at 2404.

As the dissent in *Blackfeet* noted, the "majority apparently [did not] rest its ... holding on the conclusion that the 1938 Act

incorporation. However, the legislative history of the OIWA and of the IRA demonstrate that the "body corporate" is intended to be a business corporation rather than a municipal corporation. *See, e.g.* 78 Cong.Rec. 11123 (1934) (remarks of Representative Wheeler).

*repealed* the taxing authority contained in the 1924 Act." *Id.* at 769, 105 S.Ct. at 2405 (White, J., dissenting) (emphasis in the original). Rather, the Court held only that the taxing authority provided for in the 1924 Act did not apply to leases executed under the 1938 Act. This holding was based in part on the interpretation of the scope of the 1924 Act,[9] and was heavily dependent on the strong presumption that Indian lands are not subject to taxation. *Id.* at 766, 105 S.Ct. at 2403. Moreover, the Acts at issue in this case are unlike the 1938 Act in *Blackfeet* because, in this case, Congress explicitly limited tribes organizing under the IRA to the powers vested under "existing law" and failed to include the power to create tribal courts in the narrow list of additional powers. The *Blackfeet* case does not, therefore, stand for the proposition that courts are free to interpret a general repealer clause to abrogate earlier statutes that are not inconsistent.

### III.

The record in this case therefore demonstrates that Congress did explicitly abolish the power of the Muscogee (Creek) tribe to maintain a court system with general civil and criminal jurisdiction and never acted to restore that power. This decision should not be construed, however, as a determination that the Muscogee tribe is precluded from establishing any court system whatsoever. The Interior Department has maintained that "[t]he tribe may properly assign to its courts the task of making [decisions concerning its internal affairs] on behalf of the tribe or of reviewing the procedural or substantive correctness of such decisions that are made by other tribal officials. A Creek court may exist for these purposes even though it may not punish individuals for criminal offenses or compel the resolution of disputes between private parties." *See* Memorandum of Paul T. Baird, January 12, 1984, AR, Exhibit 3, Document 13, at 11. This opinion is

not to the contrary and merely holds that the defendant did not behave in a manner that was arbitrary and capricious or contrary to law when it denied funding for a Creek court system that purported to assert general civil and criminal jurisdiction.

There is no doubt that the policy of assimilation which inspired the Curtis Act had passed out of favor in the mid-thirties when the IRA and the OIWA were enacted. Nor is it the prevailing policy today. *See* Statement by the President, Indian Policy, 19 Weekly Comp.Pres.Doc. 98 (Jan. 24, 1983). There is also no question that the abolition of their traditional courts has interfered with the ability of the Creeks to exercise the rights of self-government which were consistently promised to them by the federal government. The hardships created by the Curtis Act were described by Chief Porter in a letter to the Congress in March, 1900:

[m]any trivial matters can be settled among their own people and under their own laws, without delay and with but little expense; whereas when they are required to attend United States courts they are frequently taken a long distance from their homes and kept in attendance upon the courts from time to time, and from court to court, subjecting them to great loss of time and expense. Frequently, our citizens are deprived of their liberty by being unable to give bail at places remote from their homes.

Senate Doc. No. 324, 56th Cong., 1st Sess. at 13. While the particular problems described by Chief Porter may have been solved in the last 80 years, the abolition of their tribal courts undoubtedly remains a hardship for the Muscogee people. Furthermore, recent developments in the United States District Court of Oklahoma suggest that the Muscogees may find it difficult to enforce law in their territory unless they can establish courts with general civil and criminal jurisdiction. *See, e.g., Indian County, U.S.A., Inc. v. Oklahoma,* No.

---

**9.** The Court found that the taxing provision of the 1924 Act extended only to leases executed under a 1891 Act and those executed under the 1924 Act. *Id.* at 767, 105 S.Ct. at 2404. According to the dissent, the 1924 taxing provision applied to all "unalloted lands on Indian reservations bought and paid for by the Indians and not needed for agricultural purposes." *Id.* at 770, 105 S.Ct. at 2405–06 (White, J., dissenting).

85–C–643–E (consolidated with 85–C–658–E), mem. op. (N.D.Okla. April 24, 1986).

The issue here presented is not free from doubt. There is published opinion, for example, that

> Congress has the power to abolish [tribal] courts by exercise of its plenary authority to deal with the tribes. But Congress also has the power to enhance the authority of the tribe and might by a legislative act create the authority for a tribe to act in an area previously withdrawn from its jurisdiction. Thus, even though a tribal court may have been abolished, the constitutional and charter provisions of the IRA/OIWA grant authority for a tribe to define its organizational context, which would include the reassertion of tribal judicial powers.

Pipestem & Rice, *The Mythology of the Oklahoma Indians: A Survey of the Legal Status of Indian Tribes in Oklahoma,* 6 Am.Indian L.Rev. 259, 306 n. 151 (1978). But in the present state of the law, it is to Congress, the body that abolished the Muscogee courts, and not to the courts, that plaintiff must look for a remedy.

### ORDER

For the reasons stated in the accompanying Memorandum, it is this 30th day of September, 1987, hereby

ORDERED: that defendant's motion for summary judgment is GRANTED; and it is further

ORDERED: that plaintiff's motion for summary judgment is DENIED.