MUSCOGEE (CREEK) NATION, a Federally Recognized Indian Tribe, Appellant

v.

Donald HODEL, Secretary, U.S. Department of Interior.

No. 87–5377.

United States Court of Appeals, District of Columbia Circuit.

Argued June 1, 1988.

Decided July 15, 1988.

L. Susan Work, with whom M. Leah A. Harjo, Oklahoma City, Okl., and Sherrin Watkins, Okmulgee, Okl., were on the brief for appellant.

Laura E. Frossard, Atty., Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., and Edward J. Shawaker, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Dirk D. Snel, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee.

Before ROBINSON, RUTH BADER GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In 1982, the Muscogee (Creek) Nation (hereinafter "Creeks" or "Tribe") passed an ordinance authorizing the Creek Tribal Court to enforce civil and criminal jurisdiction over Tribal members and subsequently sought funding from the Bureau of Indian Affairs (BIA) for the Tribal Court and law enforcement program. The BIA, and thereafter the Department of the Interior (Interior), denied the request for funds, maintaining that the Tribe had no power to establish Tribal Courts with civil and criminal jurisdiction. The District Court agreed. *Muscogee (Creek) Nation v. Hodel,* 670 F.Supp. 434 (D.D.C.1987). We reverse.

### BACKGROUND

In the 1830s, the Muscogee (Creek) Nation was forcibly removed from the Southeastern United States to land in what is now Oklahoma. The Creek Nation was

granted the new land in fee simple with the right to perpetual self-government. Treaty of March 24, 1832, 7 Stat. 366. Following the Civil War, the United States forced the Creeks to cede the western portion of their territory as a penalty for the Tribe's alliance with the Confederacy, but the Tribe's title to the remaining portion of the territory and its right to self-government were reaffirmed. Treaty of June 14, 1866, 14 Stat. 785.

In 1867, the Creeks established a written constitutional form of government which included a separation of powers into executive, legislative and judicial branches. Tribal district courts tried all criminal cases and minor civil cases involving Creek citizens, and a Tribal Supreme Court tried all civil cases involving an amount in controversy in excess of one hundred dollars. *Harjo v. Kleppe*, 420 F.Supp. 1110, 1120 (D.D.C.1976), *aff'd sub nom. Harjo v. Andrus*, 581 F.2d 949 (D.C.Cir.1978).

In 1887, Congress passed the General Allotment Act of February 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. § 331 *et seq.* (1983)), which provided that lands held in trust for the Indians by the United States would be divided up and parcels given to individual Indians in fee simple. White settlers could obtain surplus parcels. Allotment was justified as a means of accomplishing the then current policy of assimilation. Felix S. Cohen, Handbook of Federal Indian Law 128 (1982 ed.). The Creek's land, as well as that of the Choctaw, Cherokee,[1] Chickasaw and Seminole tribes[2] was excluded from the General Allotment Act because of Treaty provisions, and, more importantly, because those tribes held their land in fee simple. Therefore, those tribes had to *agree* to allotment. *See Woodward v. De Graffenried*, 238 U.S. 284, 294, 35 S.Ct. 764, 768, 59 L.Ed. 1310 (1915).

In 1893, Congress created the Dawes Commission and empowered it to negotiate allotment agreements with the Five Civilized Tribes, including the Creeks. Act of March 3, 1893, ch. 209, 27 Stat. 612, 645. However, over the next several years the Commission was unable to negotiate agreements with any of the Five Tribes. As a result, in 1897, Congress added several provisions to the Indian Department Appropriations Act designed to coerce the tribes to negotiate with the Commission. Act of June 7, 1897, ch. 3, 30 Stat. 62. The 1897 Act required that, after January 1, 1898, all laws passed by the councils of the Five Tribes would be subject to Presidential veto except resolutions for adjournment or acts relating to negotiations with the Dawes Commission. It also extended jurisdiction of the federal courts in Indian Territory to Five Tribes members, but provided that any agreement between the Dawes Commission and one of the tribes would suspend conflicting provisions of the Act as to the agreeing tribe.

The Creeks (as well as other tribes) nevertheless resisted. When it became apparent that the Creeks, Choctaws, Chickasaws and Cherokees[3] would not cooperate, Congress passed the Curtis Act. Act of June 28, 1898, ch. 517, 30 Stat. 495. That Act provided for forced allotment and termination of tribal land ownership without tribal consent unless the tribe agreed to allotment. It also made tribal laws unenforceable in the United States Court in Indian Territory. More importantly for our purposes, the Act purported to abolish all tribal courts in Indian Territory, effective July 1, 1898 for most tribes, but effective October 1, 1898 for the Chickasaw, Choctaw and Creek Tribes.[4] The Curtis Act also incorporated tentative agreements reached earlier with the Creek, Choctaw

---

1. All references to the "Cherokee" tribe are to the Western or Oklahoma Cherokees.

2. These tribes are known collectively as the Five Civilized Tribes because of their adaptability in developing institutions comparable in many respects to the European models. V. Deloria, Jr. and C. Lytle, American Indians, American Justice 86–87 (1983).

3. The Dawes Commission reached an agreement with the Seminoles.

4. We are advised by the parties that the Cherokees had refused to negotiate even a tentative agreement.

and Chickasaw Tribes and provided that those agreements would supersede any inconsistent provisions of the Curtis Act if ratified by the tribes by October 1, 1898. Each tentative agreement preserved tribal courts and conferred only limited jurisdiction on the federal courts.

However, the .final agreement with the Creeks (and Cherokees) unlike those of the Chickasaw and Choctaw Tribes, did not preserve the Tribal Courts. In fact, the Creek Agreement specifically stated that nothing in the agreement would be construed as reviving the Creek Tribal Courts which had been abolished by former acts of Congress. It also provided for the termination of the entire Creek government by March 4, 1906. Act of March 1, 1901, ch. 676, 31 Stat. 861. Difficulty in completing tribal rolls and resistance to allotment prevented the demise of the government and on April 26, 1906, Congress extended indefinitely the existence and government of each of the Five Tribes. Act of April 26, 1906, 34 Stat. 137. This Court has specifically held that the Creek government persisted. *Harjo v. Andrus*, 581 F.2d 949, 951 (D.C.Cir.1978).

In 1934, Congress passed the Indian Reorganization Act (IRA), Act of June 18, 1934, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 461 *et seq.* (1983)), which provided for self-government pursuant to constitutions and permitted the tribes to organize for economic purposes pursuant to corporate charters. Certain tribes, primarily those in Oklahoma and including the Creeks, were excluded from six of the provisions of the IRA including the sections dealing with self-government and corporate charters. The legislative history reflects that one reason for the exclusion was that the tribes had made progress toward assimilation and it was thought best not to encourage return to reservations.[5] The need for similar legislation for the Oklahoma tribes was to be explored further. 78 Cong.Rec. 11126 (1934); *See also A Bill to Promote the General Welfare of the Indians of the State of Oklahoma and for Other Purposes: Hearings on S. 2047 Be-*

*fore the Senate Committee on Indian Affairs*, 74th Cong., 1st Sess. 9.

Two years later, Congress passed the Oklahoma Indian Welfare Act (OIWA). Act of June 26, 1936, 49 Stat. 1967 (codified at 25 U.S.C. §§ 501 *et seq.* (1983)). That Act, like the IRA, provided for constitutional governments and corporate charters. However, the language used in the self-government provision of the OIWA differed from that of the IRA.

In 1979, the Tribe, pursuant to the OIWA, adopted a constitution providing for three separate branches of government, including a judiciary. In 1982, the Tribe passed an ordinance allowing Tribal Courts to enforce criminal and civil jurisdiction over Tribal members and subsequently sought funding from the BIA for the Tribal Courts and a law enforcement program. The BIA and Interior denied the request based on the Curtis Act's purported abolition of Tribal Courts together with the failure of the subsequent Creek Agreement or the OIWA to revive them. That denial precipitated this action. On cross-motions for summary judgment, the District Court ruled in favor of the Interior and the Tribe has appealed.

ANALYSIS

*Abolition of the Tribal Courts*

■ The Tribe first argues that the Curtis Act did not abolish Tribal Courts. Rather, it contends that the Curtis Act was designed only to force allotment and that Congressional intent to abrogate earlier treaties was not expressed with sufficient clarity. However, in our view, the Curtis Act unequivocally abolished the courts. That Act provided that, as of October 1, 1898 for the Creeks, "all tribal courts in Indian Territory shall be abolished, and no officer of said courts shall thereafter have any authority whatever to do or perform any act theretofore authorized by any law in connection with said courts...." Act of June 28, 1898, 30 Stat. 495, § 28. The subsequent agreement with the Creeks spe-

---

5. Senator Thomas of Oklahoma was also concerned that the IRA would reduce Oklahoma's property tax revenue. 78 Cong.Rec. 11126 (1934).

cifically provided that the agreement would not be construed as reviving the Tribal Courts: "Nothing contained in this agreement shall be construed to revive or reestablish the Creek courts which have been abolished by former Acts of Congress." Act of March 1, 1901, 31 Stat. 861, ¶ 47. It also contained a provision that it would have no effect on treaty provisions except insofar as it was inconsistent with the treaty provision. *Id.* at ¶ 44.

The Tribe contends that the language abolishing Tribal Courts is without effect because it conflicts with an earlier treaty and a treaty cannot be abrogated by implication. *Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933). That statement of law is unquestionably correct. " '[T]he intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.' " *Menominee Tribe v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968) (quoting *Pigeon River Co. v. Cox Co.*, 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1934)). However, the abolition of the Tribal Courts was unambiguous. The language of both the Curtis Act and the Creek Agreement clearly expressed the intent to abrogate the power to have Tribal Courts inherent in the Tribe's power of self-government expressly reserved by earlier treaties. In addition, the Courts were not revived by the Act of April 26, 1906, 34 Stat. 137, which extended indefinitely the Creek Tribal government. That Act, by its own terms, extended only the "present" Tribal government. The Curtis Act and the Creek Agreement expressly stripped the Tribe of the power to have courts and, therefore, that power was not part of the "present" Tribal government. However, that does not end our inquiry.

*Effect of the OIWA*

The Tribe also argues that even if its courts were abolished by the Curtis Act and the subsequent agreement, the OIWA repeals the earlier legislation and revives the Tribe's power to establish courts. The crux of this issue is the meaning and effect of § 503 of the OIWA together with the general repealer clause. Section 503 provides:

> Any recognized tribe or band of Indians residing in Oklahoma shall have the right to organize for its common welfare and to adopt a constitution and bylaws....

25 U.S.C. § 503. The corresponding section of the IRA provides:

> Any Indian tribe ... shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws,....
>
> In addition to all other powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: to employ legal counsel, ...; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments.

25 U.S.C. § 476.

The Interior would have this Court read into the language of § 503 of the OIWA the same limitations *expressed* in the corresponding section of the IRA. In other words, Interior would like us to read § 503 as limiting the powers of the Oklahoma tribes to those powers vested by existing law (plus certain powers enumerated in the IRA).[6] The District Court did so, stating

---

**6.** Interior wants this Court to hold that the OIWA restored no powers to the Creek government—that it simply reaffirmed the existing powers of the Tribe. This interpretation is belied by other courts' construction of the OIWA. In *Board of Commissioners v. Seber*, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943), the Supreme Court noted that the Creek Nation had been authorized by the OIWA to "resume" some of its former powers. *Id.* at 718, 63 S.Ct. at 927. In *Indian Country, U.S.A. v. Oklahoma Tax*

*Commission*, 829 F.2d 967, 981 (10th Cir.1987), *cert. denied sub nom. Oklahoma Tax Commission v. Muscogee (Creek) Nation*, — U.S. —, 108 S.Ct. 2870, 101 L.Ed.2d 2906 (1988), the Court noted that Congress had enacted the OIWA to "restore" governmental powers to the Oklahoma tribes. Together with *Harjo*, which held that the executive and legislative powers of the Creeks had never been lost, these cases support the conclusion that the OIWA "restored" the Creek's judicial powers.

that it would be anomalous to hold that the OIWA conveyed greater powers of self-government to the Oklahoma tribes than the IRA conveyed to other tribes.[7]

■ The IRA and the OIWA address the same subject, albeit for different tribes, and were enacted just two years apart. It is contrary to common sense as well as sound statutory construction to read the later, more general language to incorporate the precise limitations of the earlier statute. Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning. *Klein v. Republic Steel Corp.,* 435 F.2d 762, 765–66 (3d Cir.1970). If Congress had intended the tribal government provision to be identical to that in the IRA, it could have included a direct reference to the IRA in that provision as it did in the corporate charter provision. Indeed, Congress could have simply repealed the provisions of the IRA which exempted the Oklahoma tribes. It did neither. Therefore, it is necessary to examine the OIWA standing alone to determine if it repealed the abolition of Creek Tribal Courts.

■ The OIWA clearly does not *expressly* repeal the abolition of the Tribal Courts. It contains no reference to the Curtis Act or the related legislation. It does, however, unlike the IRA, contain a general repealer clause. Act of June 26, 1936, 49 Stat. 1967, § 9 (codified at 25 U.S.C. § 509 (1983)). Therefore, any repeal would be by implication. Generally, repeal by implication is not favored. *See e.g., United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939). Under that general rule, statutes are repealed by a general repealer clause only if they conflict. *Kremer v. Chemical Construction Co.,* 456 U.S. 461, 469, 102 S.Ct. 1883, 1891, 72 L.Ed.2d 262 (1982). However, the standard principles of statutory construction do not have their usual force in cases involving Indian law. *Montana v.*

*Blackfeet Tribe,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). In that case, Congress passed a statute dealing with mining leases on Indian land. The Act contained no reference to taxation of royalties by the states and contained only a general repealer clause. An earlier statute had permitted taxation of the royalties by the states. Montana made the same argument Interior makes here—since the two statutes did not directly conflict, the provision allowing taxation had not been repealed and was therefore applicable to leases executed under the subsequent Act. The Court focused on two rules of statutory construction applicable in Indian law cases. First, it discussed the rule providing that states may tax Indians only where Congress has clearly manifested its consent to such taxation. The Court held that the statute did not meet this requirement. More importantly, the Court in *Blackfeet* went on to hold that the State's interpretation would not satisfy the rule *requiring statutes to be construed liberally in favor of the Indians.* The Court did not rest its holding on the repeal of the 1924 Act. Rather, it held that the taxation provision of the 1924 Act could not be implicitly incorporated into the 1938 Act and was therefore inapplicable to leases executed under the 1938 Act (although it remained in effect for leases executed under the 1924 Act).

Nevertheless, the Court's reasoning is instructive as to the application of the varying and conflicting rules of statutory construction. "[I]n [Interior's] view, sound principles of statutory construction lead to the conclusion that [the Curtis Act was not repealed by the OIWA]. [Interior] fails to appreciate, however, that the standard principles of statutory construction do not have their usual force in cases involving Indian law.... '[T]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.' ... [S]tatutes are to be construed liberally in favor

---

**7.** The District Court also notes that the "corporate charter" provision of the OIWA refers directly to the IRA and uses this to support its determination that the tribal government provision is also identical to the IRA provision. *Muscogee (Creek) Nation v. Hodel,* 670 F.Supp. 434, 443 (D.D.C.1987).

of the Indians, with ambiguous provisions interpreted to their benefit." *Id.* at 766, 105 S.Ct. at 2408. (citations omitted). If there is any ambiguity as to the inconsistency and/or the repeal of the Curtis Act, the OIWA *must* be construed in favor of the Indians, i.e., as repealing the Curtis Act and permitting the establishment of Tribal Courts. The result, then, is that if the OIWA can reasonably be construed as the Tribe would have it construed, it *must* be construed that way.[8]

The OIWA confers the power to adopt a constitution. Black's Law Dictionary defines constitution as:

> The organic and fundamental law of a nation or state, which may be written or unwritten, establishing the character and conception of its government, laying basic principles to which its internal life is to be conformed, organizing the government, and regulating, distributing and limiting the functions of its different departments, and prescribing the extent and manner of sovereign powers.

Black's Law Dictionary 282 (5th ed. 1979). The Regulations designed to implement both the IRA and the OIWA define constitution as follows:

> "Constitution" or "Constitution and By-laws" means the written organizational framework of any tribe reorganized pursuant to a Federal statute for the *exercise of governmental powers.*

25 C.F.R. § 81.1(g) (emphasis added).

■ Both definitions certainly encompass the power to create courts with general civil and criminal jurisdiction. The United States Constitution contains such powers and has undoubtedly been used as a model for tribal constitutions. Constitutions are vehicles of self-government. Inherent in self-government is the power to make laws and to create mechanisms to enforce them. *See United States v. Wheeler,* 435 U.S. 313, 320, 98 S.Ct. 1079, 1084, 55 L.Ed.2d 303 (1978). It is therefore reasonable to conclude that the OIWA conferred all powers associated with self-

government, limited of course by statutes of *general* applicability.

In addition, if a later act covers the whole subject of an earlier one and is clearly intended as a substitute, it will operate to repeal the earlier act. *Kremer,* 456 U.S. at 469, 102 S.Ct. at 1891. The OIWA was passed to "reorganize" the Oklahoma tribes. It did away with allotment and included a provision for establishing a tribal government. It appears to cover the "whole subject" of the earlier legislation. It would be absurd to hold that isolated portions of the Curtis Act and the Creek Agreement survive even though the statutory context in which they appeared—allotment and assimilation—has been stripped away by the OIWA.

The legislative history is scant. At the hearings, nothing was said about the tribal government section of the OIWA. There were some general statements describing the Act as the "clarification and equalization of the legal status" of the Oklahoma tribes. *See A Bill to Promote the General Welfare of the Indians of the State of Oklahoma and for Other Purposes: Hearings on S. 2047 Before the Senate Committee on Indian Affairs,* 74th Cong., 1st Sess. 8. That indicates an intent that all of the Oklahoma tribes were to have the same legal status. An interpretation of the OIWA that permitted some Oklahoma tribes to have courts but not others would not comport with that intent.

Senator Elmer Thomas, Chairman of the Senate Committee on Indian Affairs, Chairman of the Subcommittee on the OIWA and the same Senator Thomas who had promoted exempting the Oklahoma tribes from the IRA, made the following statement at the beginning of the hearings on the OIWA:

> Having so many tribes, the policy in the past has been to legislate for each tribe individually. As a result, we have numerous laws on the statute books that apply only to Oklahoma Indians, and no one law will apply to more than one tribe

---

**8.** It is for this reason that, while we have given careful consideration to Interior's interpretation

of the OIWA, we do not defer to it.

as a rule. I do not believe that to be the best policy personally, [sic] I believe that a broad policy should be adopted, and then where necessary, provide special legislation to take care of any particular item that may arise.

*A Bill to Promote the General Welfare of the Indians of the State of Oklahoma and for Other Purposes: Hearings on S. 2047 Before the Senate Committee on Indian Affairs,* 74th Cong., 1st Sess. 10. That statement certainly indicates an intent that the piecemeal legislation, i.e., those statutes applicable to only one or a few tribes, be done away with and a uniform law passed. Reading the OIWA as Interior would have it read would result in a perpetuation of the piecemeal legislation rather than its elimination. The very existence of the Curtis Act conflicts with the purpose of eliminating piecemeal legislation.

The Interior points to some statements in the legislative history which purportedly indicate that the OIWA was intended to confer the same powers on the Oklahoma tribes conferred on other tribes by the IRA. In other words, Interior contends that the OIWA was intended to be "identical" to the IRA and therefore limit the tribes' powers to those vested by existing law. Indeed, the legislative history states that the OIWA would "permit the Indians of Oklahoma to exercise substantially the same rights and privileges as those granted to Indians outside of Oklahoma by the [IRA]." H.R.Rep. No. 2408, 74th Cong., 2d Sess. 3 (1936). However, that statement is ambiguous at best. It could easily be read as expressing the intent that the Oklahoma Indians have the same powers as all other tribes, regardless of the source of those powers. If the intent of the OIWA was to give the Oklahoma tribes the same powers of self-government *exercised* by the IRA tribes, then the OIWA necessarily repealed the Curtis Act. "[T]ribal courts are important mechanisms for protecting significant

tribal interests. Federal pre-emption of a tribe's jurisdiction to punish its own members for infractions of tribal law would detract substantially from tribal self-government...." *Wheeler,* 435 U.S. at 332, 98 S.Ct. at 1090. (footnote omitted).

Although not critical to our decision, the Court is cognizant that, under current law, the State of Oklahoma has no jurisdiction over Indians within the bounds of the Creek "Indian Country." [9] *State v. Brooks,* No. S–85–117 (Okla.Crim.App., Nov. 7, 1986); *see also Indian Country, U.S.A. v. Oklahoma Tax Commission,* 829 F.2d 967 (10th Cir.1987), *cert. denied sub nom. Oklahoma Tax Commission v. Muscogee (Creek) Nation,* —— U.S. ——, 108 S.Ct. 2870, 101 L.Ed.2d 2906 (1988). Nor do the federal courts have jurisdiction over minor Indian on Indian crime within Indian Country.[10] "When there is a crime by an Indian against another Indian within Indian country only those offenses enumerated in the Major Crimes Act [18 U.S.C. § 1153] may be tried in federal courts." *United States v. Welch,* 822 F.2d 460, 464 (4th Cir.1987) (citing *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977)). To construe the OIWA as the Interior wants us to could result (until some change in the law) in a jurisdictional "no man's land."

The District Court aptly noted that this issue is not free from doubt. The legislative history is not clear and the language of § 503 can easily be construed as permitting the establishment of Tribal Courts. For this very reason, this Court must construe the OIWA to benefit the Tribe. *Blackfeet,* 471 U.S. at 766, 105 S.Ct. at 2403. Accordingly, we hold that the Curtis Act was repealed by the OIWA and that therefore the Muscogee (Creek) Nation has the power to establish Tribal Courts with civil and criminal jurisdiction, subject, of course, to

---

**9.** "Indian Country" is defined in 18 U.S.C. § 1151.

**10.** There is one narrow exception to this general rule. Where an Indian defendant has been charged with one of the crimes enumerated in the Major Crimes Act, 18 U.S.C. § 1153, he is

entitled to an instruction on lesser included offenses. If convicted of a lesser included offense, the conviction is a valid one. *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *United States v. John,* 587 F.2d 683 (5th Cir.1979).

the limitations imposed by statutes *generally* applicable to *all tribes*.[11]

---

**11.** Because this Court has determined that the provision of the Curtis Act which abolished tribal courts has been repealed by the OIWA, it is unnecessary for us to reach the Tribe's argument that the Curtis Act was a Bill of Attainder.