**Navajo NATION, Plaintiff–Appellant,**

v.

**DEPARTMENT OF HEALTH & HUMAN SERVICES, Secretary, Defendant–Appellee.**

**No. 99–16129.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 2000.

Submission deferred Dec. 6, 2000.

Resubmitted April 2, 2001.

Filed April 8, 2002.

---

Thomas W. Christie, Assistant Attorney General, Navajo Nation, Window Rock, Navajo Nation (Arizona), for the plaintiff-appellant.

John S. Koppel, Appellate Attorney, Civil Division, Department of Justice, Washington, DC, for the defendant-appellee.

Before B. FLETCHER, O'SCANNLAIN, and GOULD, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge.

We must decide whether the Temporary Assistance for Needy Families program, administered by the Department of Health and Human Services, qualifies as a program "for the benefit of Indians because of their status as Indians" within the meaning of the Indian Self–Determination and Education Assistance Act.

I

In 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA" or the "Act"), which made extensive changes in the welfare laws of this country. The Act replaced the Aid to Families with Dependent Children program ("AFDC") with a new program of temporary assistance and work requirements, called Temporary Assistance for Needy Families ("TANF"). 42 U.S.C. § 601, et seq. Under the Act, the federal government provides TANF block grants to interested states, 42 U.S.C. § 603, or to Indian tribes, 42 U.S.C. § 612, which then can fund welfare programs for citizens within their jurisdictions, subject to federal conditions.

In October 1997, the Navajo Nation (the "Tribe") applied to the Secretary of Health and Human Services ("HHS") to receive TANF funds for citizens within its jurisdiction. However, rather than apply for TANF funds under the provision of PRWORA which allowed Indian tribes to apply directly, 42 U.S.C. § 612, the Tribe applied for a funded contract under a provision of the Indian Self Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 450f. Under this provision, the Secretary of Health and Human Services, as well as the Secretary of the Interior, are "directed, upon the request of any Indian tribe ..., to enter into a self-determination contract" with the tribe. 25 U.S.C. § 450f(a)(1).

The ISDEAA defines a "self determination contract" as "a contract ... entered into ... between a tribal organization and the appropriate Secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law...." 25 U.S.C. § 450b(j). In other words, to the extent that the federal government provides services to members of Indians tribes, or pays others to provide those services, the ISDEAA gives Indian tribes the option of accepting those funds and providing the services "in-house," as it were.

Not all federal programs, however, are eligible to be transferred to Indian tribes through a self-determination contract; only those programs described in § 450f(a)(1)(A)-(E) are eligible. In this case, the Tribe applied for a self-determination contract under § 450f(a)(1)(E),

which includes programs "for the benefit of Indians because of their status as Indians...." 25 U.S.C. § 450f(a)(1)(E). The Tribe chose to apply for TANF funds under the ISDEAA, rather than under the PRWORA, primarily because it would have received additional funds for administrative costs under the ISDEAA which it would not have received under the PRWORA.

In a November 1997 letter to the Tribe, the Secretary rejected, for two independent reasons, the application because it went "beyond the scope of programs ... covered under [§ 450f(a)(1)]." 25 U.S.C. § 450f(a)(2)(E). First, the Secretary ruled that because the TANF program served all of the poor, whether Indian or not, the "TANF program is not one that operates for the particular benefit of Indians," in contravention of § 450f(a)(1)(E). Second, she determined that, even if the TANF program did operate for the particular benefit of Indians, a contract for TANF funds did not meet the requirements of a "self-determination contract" in § 450b(j) because the "TANF program is not a program under which the Federal government would otherwise directly provide services to Indian tribes pursuant to Federal law."

The Tribe attempted to appeal the Secretary's decision through administrative procedures, but the Board of Indian Appeals determined that the only remedy available was suit in federal court. As a result, the Tribe filed this suit in February 1998 in United States District Court for the District of Arizona and asked the court to order the Secretary to enter into a self-determination contract with it for TANF funds. The Secretary filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), which was granted by the district court on the second ground asserted by the Secretary, that a contract for TANF funds did not meet the requirements of a "self-determination contract," as defined in § 450b(j). The Tribe filed this timely appeal.

II

■ Although the district court agreed with the Secretary's interpretation of the ISDEAA, the district court did not consider whether the Secretary's interpretation is entitled to substantial deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Consequently, we ordered supplemental briefing on this issue. Under *Chevron*, we employ a two-step process to determine whether we should accord deference to an agency interpretation. First, we ask "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If the meaning of the statute is unambiguous, then "that is the end of the matter...." *Id.* If, on the other hand, the meaning of the statute is ambiguous, then we ask whether the agency's interpretation is a reasonable construction of the statute. *Id.* at 843, 104 S.Ct. 2778.

The Secretary ruled that, because the TANF program "is intended to operate for the benefit of needy families without consideration of the status of these families as Indian or non-Indian," the TANF program "is not one that operates for the particular benefit of Indians...." Thus, the Secretary ruled that the TANF program did not meet the strictures of § 450f(a)(1)(E), that the program which the Tribe seeks to administer was "for the benefit of Indians because of their status as Indians...." 25 U.S.C. § 450f(a)(1)(E). The Tribe argues that the Secretary misconstrued § 450f(a)(1)(E) in making this determination. The Tribe argues that § 450f(a)(1)(E) unambiguously supports the proposition that the TANF program is

a one "for the benefit of Indians because of their status as Indians . . . ."

The Tribe's argument in this regard rests exclusively on the fact that, in enacting the PRWORA, Congress separated the provision under which states can apply for a TANF block grant, 42 U.S.C. § 603, from the provision under which Indian tribes can apply for a TANF block grant, 42 U.S.C. § 612. The fact that Indians apply for funds under a different provision than do states does not make the TANF program one "for the benefit of Indians because of their status as Indians," if the funds the Indians receive are otherwise identical to the funds states receive. That is, if the funds are otherwise identical, Indians receive no marginal "benefit" from the separate application provision.

It is not the case, however, that the TANF funds which Indians receive are otherwise identical to those received by states. For example, states receiving TANF block grants are under strict limits regarding the number of years they can allow citizens to receive block grants, 42 U.S.C. § 608(a)(7), and the portion of citizens receiving block grants who must be employed, 42 U.S.C. § 607. By contrast, the PRWORA leaves open the possibility that Indian tribes may not be subject to the same constraints on their use of the block grants. 42 U.S.C. § 612(c)(2) ("The Secretary . . . shall establish for each Indian tribe . . . minimum work participation requirements [and] appropriate time limits for receipt of welfare-related services . . . consistent with the economic conditions and resources available to each tribe . . . .").

The Secretary interpreted § 450f(a)(1)(E) to require more than preferential treatment for Indians under the program in question. She interpreted "program[] . . . for the benefit of Indians because of their status as Indians" to mean

that Indians must be the *exclusive* beneficiaries of the program in question. In her letter, she ruled that the Tribe's application must be denied because "[t]he TANF program is not one that operates for the *particular* benefit of Indians . . . ." (Emphasis added.) In her brief before this Court, she elaborated on her interpretation by arguing that a program qualifies under § 450f(a)(1)(E) only if "in order to be eligible for the program an individual *must* be a member of a federally recognized Indian tribe." (Emphasis added.)

The question under the first step of the *Chevron* inquiry is whether the phrase "for the benefit of Indians because of their status as Indians" in § 450f(a)(1)(E) has an unambiguous meaning. We conclude that it does not. The plain language of the words "program[] . . . for the benefit of Indians because of their status as Indians" is susceptible both to the meaning that the program must be for the exclusive benefit of Indians and the meaning that the program can benefit non-Indians as well as Indians, but that it must benefit Indians on a preferential basis.

Moreover, we find nothing specific in the legislative history of the ISDEAA which sheds any light on which of these two meanings, if either, Congress had in mind when it enacted § 450f(a)(1)(E). Although the legislative history of the act contains multifarious general statements regarding the overall purpose of the IS-DEAA, nowhere is the phrase "for the benefit of Indians because of their status as Indians" discussed. Under *Chevron* step one, such general pronouncements regarding the overall purpose of a complex statute do not constitute conclusive evidence that Congress has "directly spoken" to the meaning of the "precise" statutory phrase in dispute. *See Natural Res. Def. Council, Inc. v. EPA,* 966 F.2d 1292, 1302 (9th Cir.1992) ("The legislative history is

not illuminating. Although it explains that a purpose of the permitting scheme was to attack the most serious sources of discharge first, this general goal is not helpful in discerning the specific meaning of 'municipal separate storm sewer system serving a population.' "); *see also Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 234–35, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (holding that, although the legislative history showed that the general purpose of the statute was to punish nations which violated international fishing quotas, this did not establish that the statutory phrase "diminish the effectiveness of an international fishery conservation program" unambiguously meant "violation of international fishing quotas"); *Chevron,* 467 U.S. at 862, 104 S.Ct. 2778 (rejecting argument that the legislative history made the statutory language unambiguous because "[t]he general remarks pointed to by respondents were obviously not made with this narrow issue in mind and they cannot be said to demonstrate a Congressional desire" (internal quotation marks omitted)). Thus, we do not find that "Congress has directly spoken to the precise question at issue," *Chevron* 467 U.S. at 842–43, 104 S.Ct. 2778, and, therefore, we move to the second step in the *Chevron* inquiry.

With regard to such second step, as we hinted above, we believe that one reasonable interpretation of "program[] . . . for the benefit of Indians because of their status as Indians" is that Indians must be the exclusive beneficiaries under the program. The language indicates that Indians must benefit under a program in a way that other people do not. As a matter of logic, this could mean either that Indians (1) must be the exclusive beneficiaries of the program, as the Secretary argues, or (2) need only derive some benefit from the program beyond that which other program beneficiaries receive. Thus, the Secretary's interpretation of the ISDEAA is one reasonable possibility, and therefore is entitled to deference under *Chevron.*

### III

Although we hold that both prongs of *Chevron* are satisfied in this case, we must confront three arguments that the Secretary's interpretation is nonetheless not eligible for deference under *Chevron.*

### A

■ One could argue against the eligibility of *Chevron* deference in this case as conflicting with the general rule of interpretation of statutes enacted for the benefit of Indian tribes; namely, that such statutes "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). That is, even if the meaning of provisions of the ISDEAA are ambiguous, that statute was undoubtedly enacted for the benefit of Indian tribes, and, therefore, instead of deferring to agency interpretations in such circumstances, the court should construe the statute in a way that benefits Indians. Thus, to some extent, the *Chevron* rule of statutory interpretation and the *Blackfeet Tribe* rule of statutory interpretation conflict with one another in this case. We have dealt with this conflict by discarding the *Blackfeet Tribe* rule in favor of the *Chevron* rule whenever these two general rules of interpretation intersect in the same case.[1] *Williams v.*

---

1. We recognize that two Circuits disagree with our rule deferring to agency interpretations of statutes enacted for the benefit of Indians. *Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455, 1461–62 (10th Cir.1997) (rejecting Ninth Circuit approach); *Albuquerque Indian*

*Babbitt,* 115 F.3d 657, 663 n. 5 (9th Cir. 1997) ("We have therefore held that the liberal construction rule must give way to agency interpretations that deserve *Chevron* deference ...."); *Seldovia Native Ass'n, Inc. v. Lujan,* 904 F.2d 1335, 1342 (9th Cir.1990) (applying *Chevron* deference instead of canon of statutory construction favoring Indians); *Haynes v. United States,* 891 F.2d 235, 239 (9th Cir.1989) (declining to apply canons of interpretation favoring Indians "in light of competing deference given to an agency charged with the statute's administration"). Thus, given that the Secretary's interpretation of the ISDEAA otherwise meets all of the conditions for *Chevron* deference, we accord it that deference notwithstanding the fact that the ISDEAA was enacted for the benefit of Indian tribes.[2]

## B

■ Another argument against the eligibility of *Chevron* deference in this case is that the Secretary's construction of the ISDEAA came in the form of a mere letter denying the Tribe's application. In *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), the Supreme Court declined to accord *Chevron* deference to an agency "opinion letter." *Id.* at 586–87, 120 S.Ct. 1655. The Court stated that "[i]nterpretations such as those

in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Id.* at 587, 120 S.Ct. 1655.

Unlike *Christensen,* however, the Secretary's letter in this case was not an "opinion letter," but, rather, a final, albeit informal, adjudication on the merits denying the Tribe's application for funds. The Supreme Court routinely accords *Chevron* deference to statutory interpretations performed by agencies in the course of informal adjudications, including an informal adjudication in the form of a letter. *E.g., NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256–58, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (according *Chevron* deference to letter from Comptroller of the Currency granting NationsBank's application to sell annuities). *See also Christensen,* 529 U.S. at 590, 120 S.Ct. 1655 (Scalia, J., concurring in part and concurring in the judgment) (citing cases). Congress delegated to the Secretary the authority to adjudicate in this manner. 25 U.S.C. § 450f(a)(2)(E) ("[T]he Secretary shall, within ninety days after receipt of the proposal, approve the proposal and award the contract unless the Secretary provides written notification to the applicant that contains a specific find-

---

*Rights v. Lujan,* 930 F.2d 49, 58–59 (D.C.Cir. 1991) (same).

2. The dissent decries the fact that under our precedents, where *Chevron* encounters a conflict with *Blackfeet Tribe, Chevron* controls. *See* Dissent at 875 ("We are the only circuit to hold that in the event of a conflict between the principles of administrative agency deference under [*Chevron*] ... and deference to Native American interests under [*Blackfeet Tribe*] ..., the latter must give way.... No other circuit has since followed our lead, while two other have expressly gone the other way.") (citations omitted), 880 ("Instead of

*Chevron* deference, ... I believe the appropriate interpretive principle to apply here is that of construing statutory ambiguities in favor of Native American interests under *Blackfeet Tribe.*"). Whatever the merits of the dissent's view—it presents no compelling argument that our precedents are wrong, but merely points out that other circuits do not agree with them—our cases compel this recognition, and we respectfully decline the dissent's invitation to flout our court's prior decisions. *See United States v. Camper,* 66 F.3d 229, 232 (9th Cir.1995) ("[O]nly a panel sitting en banc may overturn existing Ninth Circuit precedent.").

ing that clearly demonstrates that ... the program, function, service, or activity ... that is the subject of the proposal is beyond the scope [of programs authorized by Congress].").  Thus, we are bound to accord *Chevron* deference to the Secretary's letter given that such deference is otherwise appropriate.

### C

■ Finally, the Tribe argues against the eligibility of *Chevron* deference in this case because two different agencies, HHS and Interior, administer the ISDEAA. There is nothing in the theory underlying *Chevron*, however, that disqualifies per se agency interpretations of statutes administered by more than one agency from receiving substantial deference.

### 1

■ We are obligated to defer to agency interpretations of statutes because we are obligated to follow Congress's implicit desire to delegate interpretative authority to the particular agencies it selects to administer its statutes. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 696, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) ("When Congress, through express delegation or the introduction of an interpretive gap in the statutory structure, has delegated policymaking authority to an administrative agency, the extent of judicial review of the agency's policy determinations is limited."); *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990) ("A precondition to deference under *Chevron* is a congressional delegation of administrative authority."). Congress's implicit desire to delegate interpretative authority to the particular agencies it selects to administer its statutes is not less evident simply because Congress selected more than one particular agency to administer a single statute.

Congress very clearly delegated administrative authority over the ISDEAA to both HHS and Interior. The ISDEAA directs "[t]he Secretary ..., upon the request of any Indian tribe ..., to enter into a self-determination contract...." 25 U.S.C. § 450f(a)(1). The ISDEAA defines "Secretary" to mean "either the Secretary of Health and Human Services or the Secretary of the Interior or both." 25 U.S.C. § 450b(i). As a result, there is no reason to disqualify per se interpretations of the ISDEAA by HHS or Interior from receiving *Chevron* deference. Indeed, in *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471 (9th Cir.1987), we accorded *Chevron* deference to HHS's interpretation of "Indian tribe" in another section of the ISDEAA, apparently unconcerned that both HHS and Interior administered the ISDEAA. *Id.* at 1472–73 ("The construction of the statute by the agency charged with its administration is entitled to substantial deference."), 1476 ("As discussed above, the legislative history does not indicate that Congress intended to preclude the agency interpretation. The court must, therefore, defer to that interpretation.").

### 2

Although there is language in one Supreme Court opinion which arguably suggests that it is inappropriate to accord *Chevron* deference to agency interpretations of statutes administered by more than one agency, we do not think it controlling here. In *Bowen v. American Hospital Ass'n*, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986), the Supreme Court stated, in dicta, *id.* at 643, 106 S.Ct. 2101 ("Even according the greatest respect to the Secretary's action, ...."), that there was no basis for *Chevron* deference with regard to an HHS interpretation of section 504 of the Rehabilitation Act of 1973, ostensibly because twenty-six agencies besides HHS also had promulgated regula-

tions under that statutory provision, *id.* at 642 n. 30, 106 S.Ct. 2101. The reason so many other agencies had promulgated regulations under that statutory provision, however, was that § 504 is an anti-discrimination law generally applicable to all federal agencies.[3] In other words, Congress did not delegate authority to *administer* § 504 to any particular agency or agencies. Therefore, the necessary predicate of *Chevron* deference—congressional delegation of administrative authority—was missing.[4] This, of course, is much different from the case at hand, where Congress *did* delegate administrative authority over the ISDEAA to two particular agencies.[5]

### 3

The dissent protests that the distinction between "administrative" and "interpretive" authority is false because (1) "it is the delegation of authority to interpret a statute which triggers *Chevron* deference," and (2) "any agency that has been delegated interpretive authority can be said to 'administer' the statute." Dissent at 877 n. 1. With respect, however, we believe that there is a world of difference between a law that delegates authority to one or more organizations to administer it, like the statute involved in this case, and an anti-discrimination law generally applicable to all agencies, like the law in *American Hospital.*

In the former case, Congress has said: here is the general outline of what we command, and we give you the authority to develop policy and to fill in the details. An agency thus has freedom to develop policy in implementing the outline, subject only to staying within Congress's grant of

---

**3.** Section 504 of the Rehabilitation Act of 1973 reads:

> No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794.

**4.** This observation also explains language similar to *American Hospital* found in a line of cases from the D.C. Circuit. For example, in *Proffitt v. FDIC*, 200 F.3d 855 (D.C.Cir. 2000), the court stated that "[w]hen a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference." *Id.* at 860, 104 S.Ct. 2778. The context in which this statement was uttered, however, was much like the context in *American Hospital.* The question in *Proffitt* was whether *Chevron* deference should be accorded to the FDIC's interpretation of the word "penalty" in 28 U.S.C. § 2462. *Id.* This statute reads:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced with-

in five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462. Congress did not delegate administrative authority to any particular agency to administer this statute; it is a generally applicable statute of limitations by which all agencies must abide. Thus, as in *American Hospital*, the predicate decision by Congress to delegate administrative authority to a particular agency was lacking.

**5.** The dissent criticizes our reading of *Proffitt*, and argues that in *Scales v. INS*, 232 F.3d 1159 (9th Cir.2000) we cited the D.C. Circuit's decision in *Proffitt* as support for refusing to accord *Chevron* deference to the U.S. State Department's definition of the requirements for American citizenship. *See Scales*, 232 F.3d at 1165 ("When a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference." (citing *Proffitt*, 200 F.3d at 860)). Au contraire! In *Scales* it was clear that "[d]etermination of Petitioner's citizenship is not a duty of the State Department ... but of the Attorney General," *id.;* thus, *Scales* simply did not involve the two-agency problem that is presented in this case.

authority. In the latter case, however, Congress itself has developed policy and mandated compliance. The agency (or agencies) subject to such a command have only to interpret the congressional mandate and to apply it. *See United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001) ("[W]hether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices...."). It makes eminent sense that an agency in the former position has a far superior claim to deference than an agency in the latter: an agency that has freedom to develop policy in its interpretation of a congressionally-delegated statutory scheme should be entitled to far more leeway than one merely told to comply with policy formulated by Congress itself. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delega-

tion from Congress to the agency to fill in the statutory gaps."); *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778 (" 'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974))).

Thus, even if the language from *American Hospital* is not dicta—which we believe it is—the distinction between the statute at issue in that case and the statute here sufficiently explains why we reach a different result than the *American Hospital* Court. We therefore do not read *American Hospital* to bar us from applying *Chevron* deference in this case.[6]

4

We are mindful of the fact that when more than one agency interprets a statute, such agencies might, at some point, reasonably interpret the statute in different and conflicting manners.[7] Al-

---

**6.** Moreover, the Court in *American Hospital* noted that *Chevron* deference was inappropriate in that case because it was unlikely that the twenty-seven agencies which promulgated regulations under § 504 had any expertise relative to the courts in interpreting language that generally prohibited discrimination. *American Hospital*, 476 U.S. at 642 n. 30, 106 S.Ct. 2101. By contrast, there can be little doubt that the two agencies to whom Congress delegated administrative authority over the ISDEAA, both of which oversee many programs involving Indians, have expertise relative to the courts in determining which of their programs meet the statutory requirements for a self-determination contract.

**7.** The dissent suggests that *Chevron* deference when more than one agency is involved is impractical for two reasons. First, it argues that some sort of line must be drawn with regard to the number of agencies to whom Congress can delegate administrative authori-

ty without disrupting *Chevron* deference to any or all of them. Second, the dissent seems to contend that *Chevron* deference in the multiple-agency context will create an undesirable race between agencies to interpret statutes and to have those interpretations approved by a court. With respect, it seems that the dissent's fears are misplaced.

As to the dissent's first concern, while it is perhaps possible in theory that Congress might delegate administrative authority over the same statute to an unwieldy number of agencies, Congress has every reason not to do so because it would not want to disrupt the administration of its own statutes. And even if Congress did engage in the kind of mass delegation the dissent fears, once any two of the delegee agencies disagreed over an interpretation of the statute, the courts would likely be called upon to select the proper interpretation of the statute.

The dissent's second concern also seems overwrought, given that a first interpreta-

though we do not confront such a situation in this case, we do not believe that the theoretical possibility of such a situation is sufficient grounds to jettison *Chevron* deference in the many situations where only one of the agencies has weighed in on a particular question of statutory interpretation, which is the case here, or where all of the agencies weigh in on a question in the same way, which was the case in *Cook Inlet*, 810 F.2d at 1474. In those circumstances where agencies do offer conflicting interpretations, we would be forced to employ some form of de novo review, either to choose the most reasonable of the reasonable interpretations offered by the agencies or to fashion our own interpretation of the statute. *See Commonwealth Edison Co. v. Vega*, 174 F.3d 870, 875 (7th Cir.1999) ("A final complication is that the administration of ERISA is shared between the Labor Department and the Treasury Department.... [But] there is no conflict between the two agencies and therefore no need to decide which should have the whip hand.").

5

We therefore conclude that, in addition to satisfying both prongs of *Chevron*, the Secretary's interpretation of the ISDEAA

is eligible for deference under *Chevron*. As a result, we hold that the Secretary was not obligated to approve the Tribe's self-determination contract for TANF funds.[8]

IV

For the foregoing reasons, the district court's judgment for the Secretary is

AFFIRMED.

BETTY B. FLETCHER, Circuit Judge, dissenting:

I dissent. Reduced to its simplest terms, the majority opinion defeats the purpose of the Indian Self Determination Act by allowing Indians to administer federal programs but denying them the funds to do the job. By pursuing a rationale that was advanced by neither party, the majority opinion bends over backwards to accord *Chevron* deference where none is due. In the process, the majority ignores congressional intent, as well as relevant Supreme Court authority, and creates a circuit split on an important question of administrative and Indian law.

We are the only circuit to hold that in the event of a conflict between the principles of administrative agency deference

tion—even if approved by a court—does not create an immutable rule. Even if a court approves an agency's interpretation of an ambiguous statute, it does not establish that such an interpretation is *the* interpretation of the statute. It merely establishes that such an interpretation is one of many reasonable interpretations of the statute. Indeed, *Chevron* allows an agency to change its interpretation of an ambiguous statute at any time and obligates courts to defer to the new interpretation—no matter how different it is from the old interpretation. *See Rust v. Sullivan*, 500 U.S. 173, 186, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("This Court has rejected the argument that an agency's interpretation is not entitled to deference because it represents a sharp break with prior interpretations of the

statute in question." (internal quotation marks omitted)). And as for the dissent's concern that "as a practical matter, the first-mover would likely wield considerable advantages that would make a court reluctant to reverse course upon subsequent review; for example, any subsequent actor might be required to justify deviation from the original rule," Dissent at 880, we can only observe in bewildered bemusement that the dissent cites no statute or precedent that would require such a justification.

8. Because we agree with the first ground articulated by the Secretary in denying the Tribe's application, we need not consider the second ground, which was the ground relied upon by the district court.

under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and deference to Native American interests under *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985), the latter must give way. *See Williams v. Babbitt*, 115 F.3d 657, 663 n. 5 (9th Cir.1997); *Seldovia Native Ass'n, Inc., v. Lujan*, 904 F.2d 1335, 1342 (9th Cir.1990); *Haynes v. United States*, 891 F.2d 235, 239 (9th Cir.1989). No other circuit has since followed our lead, while two others have expressly gone the other way. *See Ramah Navajo Chap. v. Lujan*, 112 F.3d 1455, 1461–62 (10th Cir.1997); *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C.Cir.1991). Today, the majority widens that rift by holding that even when more than one governmental agency has been delegated interpretive authority over a statute, *Chevron* deference applies, and this deference once again outweighs any reasonable construction favoring Native American interests. This result not only runs contrary to the law of our sister circuits concerning the canon of construction for ambiguous statutes affecting Native American interests, but also contradicts the law of the Supreme Court and other circuits regarding the applicability of *Chevron* deference in situations where more than one agency possesses interpretive authority over a statute.

Under the Supreme Court's reasoning in *Bowen v. American Hospital Association*, 476 U.S. 610, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986), the majority commits legal error by applying *Chevron* deference where multiple governmental agencies share interpretive authority over a statute. In *American Hospital Association*, the Court declined to apply *Chevron* deference to a Department of Health and Human Services ("HHS") regulation interpreting § 504 of the Rehabilitation Act of 1973, in

spite of the fact that Congress had expressly delegated such rulemaking authority to then-Secretary Bowen. *Id.* at 642–43, 106 S.Ct. 2101. The Court reasoned that, because multiple agencies were authorized to promulgate regulations, "[t]here is ... not the same basis for deference predicated on expertise as we found with respect to the Environmental Protection Agency's interpretation of the 1977 Clean Air Act Amendments in *Chevron*." *Id.* at 642 n. 30, 106 S.Ct. 2101; *see also id.* at 646–47, 106 S.Ct. 2101 (finding "irresistible the inference that the Department regards its mission as one principally concerned with the quality of medical care for handicapped infants rather than with the implementation of § 504").

Similarly, in the present case, one wonders what, if any, special expertise the HHS Secretary possesses to define the role of eligible self-determination contracts. Indeed, the ISDEAA expressly cabins the Secretary's discretion to reject such contract proposals. *See, e.g.*, 25 U.S.C. § 450f(a)(1) ("The Secretary is *directed*, upon the request of any Indian tribe ... to enter into a self-determination contract....") (emphasis added); 25 U.S.C. § 450f(a)(2) ("[T]he Secretary *shall*, within ninety days after receipt of the proposal, approve the proposal and award the contract ....") (emphasis added); 25 U.S.C. § 450f(a)(4) ("The Secretary *shall* approve any severable portion of a contract proposal that does not support a declination ....") (emphasis added). Hence, the statutory basis of the Secretary's discretionary authority is even more limited in this case than was true in *American Hospital Association*.

The majority opinion seeks to reconcile its holding with *American Hospital Association* by declaring that "Congress did not delegate authority to administer § 504[] to any particular agency or agen-

cies." Maj. Op. 873. This explanation, however, is transparently false. The key question for *Chevron* deference is whether Congress either explicitly or implicitly delegated to an agency the authority to interpret the terms of a given statute, typically through the promulgation of regulations. *See, e.g., AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 377, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (according *Chevron* deference to certain FCC regulations implementing the 1996 Telecommunications Act despite the lack of any express delegation of authority to the agency to administer the statute, on the ground that § 201(b) of the Communications Act of 1934, providing that "[t]he Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this Act," constituted a sufficient grant of interpretive authority); *see also Christensen v. Harris Cty.*, 529 U.S. 576, 596–97, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (Breyer, J., dissenting) (arguing that "to the extent there may be circumstances in which *Chevron*-type deference is inapplicable—e.g., where one has doubt that Congress actually intended to delegate *interpretive authority* to an agency"—reviewing courts should review agency interpretations with only as much deference as the thoroughness and persuasiveness of their reasons would require under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)) (emphasis added). In *American Hospital Association*, the Supreme Court noted that "[s]ec-

tion 504 authorizes any head of an Executive Branch agency ... to promulgate regulations prohibiting discrimination against the handicapped." 476 U.S. at 642, 106 S.Ct. 2101. The delegation thus could not be clearer, and yet the Court refused to grant *Chevron* deference in part because more than one agency held interpretive authority over the statute. *See id.* at 642 n. 30, 106 S.Ct. 2101.

The majority characterizes this aspect of the Court's opinion as dicta. I disagree; under any reasonable reading, the above-quoted passages constituted an important part of the *American Hospital Association* Court's rationale in deciding the outcome of that case. Furthermore, even if dicta, it is Supreme Court dicta, which we may not—indeed, must not—discard lightly. *See United States v. Baird*, 85 F.3d 450, 453 (9th Cir.1996) ("We treat Supreme Court dicta with due deference."); *Zal v. Steppe*, 968 F.2d 924, 935 (9th Cir.1992) (Noonan, J., concurring in part and dissenting in part) (noting that, because Supreme Court dicta "have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold," we do "not blandly shrug them off because they were not a holding"). In the face of this obligation, the majority opinion fails to offer a single persuasive reason to ignore the rationale behind the Court's holding in *American Hospital Association*.[1] To the contrary, the majority apparently prefers to invent ways to defer to the interpretations of an Executive Branch official, rath-

---

1. In trying to distinguish *American Hospital Association*, the majority opinion apparently seeks to create a distinction between an agency's "administrative" and "interpretive" authority. However, this distinction is a false one, since it is the delegation of authority to interpret a statute which triggers *Chevron* deference, and any agency that has been delegated interpretive authority can be said to "administer" the statute. *See Chevron*, 467

U.S. at 843–44, 104 S.Ct. 2778. Hence, the key distinction in *American Hospital Association, 106 S.Ct. 2101* was not that Secretary Bowen had somehow been delegated only "rulemaking" as opposed to "administrative" authority. Rather, it was the fact that *multiple* agencies had been granted authority to promulgate rules interpreting the statute in question.

er than to heed a direct pronouncement of the Supreme Court.

By contrast, the D.C. Circuit has properly followed the Supreme Court's lead by refusing to accord *Chevron* deference where two or more agencies have been delegated authority to interpret a statute. In *Proffitt v. FDIC*, 200 F.3d 855 (D.C.Cir. 2000), the court flatly stated that "[w]hen a statute is administered by more than one agency, a particular agency's interpretation is not entitled to *Chevron* deference." [2] 200 F.3d at 860 (citing *American Hosp. Ass'n*, 476 U.S. at 643 n. 30, 106 S.Ct. 2101). Prior cases in the D.C. Circuit have consistently held this position. *See, e.g, Rapaport v. United States Dep't of Treasury*, 59 F.3d 212, 216–17 (D.C.Cir.1995) (declining to accord *Chevron* deference to the Office of Thrift Supervision's interpretation of a banking statute "because that agency shares responsibility for the administration of the statute with at least three other agencies."); *Benavides v. United States Bureau of Prisons*, 995 F.2d 269, 272 n. 2 (D.C.Cir.1993) ("*Chevron* does not apply to agency interpretations of statutes ... that are administered by multiple agencies."); *Wachtel v. OTS*, 982 F.2d 581, 585 (D.C.Cir.1993); *Professional Reactor Operator Soc. v. United States Nuclear Reg. Comm'n*, 939 F.2d 1047, 1051 (D.C.Cir.1991). By denying *Chevron* deference to agencies that jointly hold interpretive authority over the same statute, the D.C. Circuit has preserved the integrity of the rule that *implicit* delegations deserve deference, *see Chevron*, 467 U.S. at 844, 104 S.Ct. 2778 (noting that when "the legislative delegation to an agency on a particular question is implicit rather than

explicit .... a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"), by foreclosing the peculiar and potentially disruptive result that multiple agencies could "implicitly" each be given controlling authority over a specific area of statutory interpretation with no corresponding duty to harmonize their interpretations. *See Salleh v. Christopher*, 85 F.3d 689, 692 (D.C.Cir.1996) ("[We] have declined to defer to an agency's interpretation of a statute when more than one agency is granted authority to interpret the same statute .... [since i]n such cases, *it cannot be said that Congress implicitly delegated to one agency authority to reconcile ambiguities or to fill gaps, because more than one agency will independently interpret the statute.*") (citations and footnote omitted) (emphasis added). "The alternative would lay the groundwork for a regulatory regime in which either the same statute is interpreted differently by the several agencies or the one agency that happens to reach the courthouse first is allowed to fix the meaning of the text for all." *Rapaport*, 59 F.3d at 216–17. Thus, the majority opinion's attempt to avoid a circuit split by distinguishing *Proffitt* and supporting case law is patently unavailing.

In eschewing Supreme Court precedent, as well as the D.C. Circuit's persuasive authority, the majority opinion opens itself up to a number of potentially insuperable difficulties. In particular, the majority opinion provides no indication as to how many agencies are too many to accord *Chevron* deference. Three? Four? Twen-

---

**2.** Recently, in *Scales v. INS*, 232 F.3d 1159, 1165 (9th Cir.2000), we held that the Attorney General (and not the State Department) possessed the authority to make citizenship determinations for people inside the U.S. In so deciding, we cited the above quoted passage

from *Proffitt* as support for refusing to accord *Chevron* deference to the U.S. State Department's definition of the requirements of American citizenship, even though the two governmental entities held joint authority to define the requirements of citizenship. *Id.*

ty-six? Moreover, in the event of a conflict between the reasonable statutory interpretations of two or more agencies, how is a court to decide? The majority concedes that in such an event, "we would be forced to employ some form of de novo review, either to choose among the most reasonable of the reasonable interpretations offered by the agencies or to fashion our own interpretation of the statute." Maj. Op. 875. Ironically, this concession amounts to little more than an admission that courts would eventually be forced to abandon the *Chevron* doctrine in favor of de novo review at some future date. Such a lame prospective solution is hardly a basis to ignore the powerful signal sent by the Supreme Court in *American Hospital Association—viz.*, when more than one government agency has been granted the authority to interpret a statute, no deference should apply.

It is largely because of the inherent difficulties posed by the potential for interagency conflict that the D.C. Circuit, in *Public Citizen Health Res. Group v. FDA*, 704 F.2d 1280 (D.C.Cir.1983), first established the rule of non-deferential review in such situations. "Any other conclusion would produce an intolerable situation in which different agencies could adopt inconsistent interpretations of the [statute] and substantially complicate the administration of the Act." *Id.* at 1287; *see also Benavides*, 995 F.2d at 272 n. 2 (citing *Public Citizen* ). First, parties regulated by more than one agency's interpretation will have difficulty conforming to multiple rules simultaneously to the extent that those rules conflict. This problem does not exist when a single agency granted interpretive authority merely recants or amends a particular iteration of an interpretive rule.

Second, a strong argument could be made that in the event of a future interagency conflict, courts would be bound by the first agency's reasonable interpretation. The Supreme Court has recently stated that "[d]eference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000); *see also Chevron*, 467 U.S. at 843, 104 S.Ct. 2778 ("The power of an administrative agency to administer a congressionally created … program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.") (internal quotation marks and citation omitted). Taken at face value, this means that an agency's power to interpret statutory ambiguities, and to receive deference for its reasonable interpretations from reviewing courts, is consistent with a power to close statutory ambiguities. Thus, we should expect that the delegation of interpretive authority to more than one agency would mean that no agency's interpretation should receive deference, because no agency would have the power to foreclose interpretations by other agencies. In addition, as a practical matter, the first-mover would likely wield considerable advantages that would make a court reluctant to reverse course upon subsequent review; for example, any subsequent actor might be required to justify deviation from the original rule. For both practical and legal purposes, then, it would appear that the "correct" statutory interpretation would depend upon which government agency got into court first—a patently absurd result. *Cf. Rapaport*, 59 F.3d at 217 (finding no "reason to believe that the congressional delegation of administrative authority contemplates such peculiar corollaries").

Instead of *Chevron* deference, which should be precluded for reasons discussed above, I believe the appropriate interpretive principle to apply here is that of construing statutory ambiguities in favor of Native American interests under *Blackfeet Tribe.* Cases involving Native American interests implicate special interpretive considerations. In *Albuquerque Indian Rights v. Lujan,* the D.C. Circuit decided that "the liberality rule applied in *Blackfeet Indians* and other cases involving native [sic] Americans derives from principles of equitable obligations and normative rules of behavior, rather than from ordinary statutory exegesis." 930 F.2d at 59. The D.C. Circuit based this decision upon its prior ruling in *Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439 (D.C.Cir. 1988), in which it had agreed that " 'the canons of construction applicable in Indian law are rooted in the unique trust relationship' " between the United States government and Native Americans, *id.* at 1444–45 (quoting *Blackfeet Tribe,* 471 U.S. at 766, 105 S.Ct. 2399), and "[b]ased on the special strength of this canon" the court "declined to defer to [the agency's] interpretation of the governing statute, which had not followed the canon." *Albuquerque Indian Rights,* 930 F.2d at 59 (citing *Muscogee (Creek) Nation,* 851 F.2d at 1445 n. 8).

Admittedly, our own precedent does not support such a broad conclusion. *See, e.g., Haynes, supra* (holding that Chevron deference should trump the canon of construction favoring Native American interests). Nevertheless, it also does not mandate that, where more than one agency possesses interpretive authority over a statute, reasonable interpretations by *any* agency can trump alternative interpretations that would benefit Native Americans. Such an approach extends abrogation of the deference owed to Native American interests under *Blackfeet Tribe* to areas where no countervailing defer-

ence to an agency interpretation is due, a result not required by *Haynes* and its progeny.

The majority opinion suggests that as a result of the holding in *Cook Inlet Native Association v. Bowen,* 810 F.2d 1471 (9th Cir.1987), we have already found that *Chevron* deference is appropriate in the ISDEAA context. However, the *Cook Inlet* court never addressed whether the Act's statutory purpose precluded *Chevron* deference. In addition, there the precise question of whether *Chevron* deference applies when two or more government entities are charged with interpreting a particular statutory provision was not at issue. I would find that no *Chevron* deference (and, in fact, not even a *Chevron* inquiry) is appropriate here. However, I believe that an analysis of the legislative history of the ISDEAA is helpful.

Under the appropriate de novo review, the Secretary's restrictive reading of the statute cannot be reconciled with the fundamental purpose underlying the Indian Self–Determination and Education Assistance Act ("ISDEAA"). While I agree with the majority that there is textual ambiguity in the statutory phrase "for the benefit of Indians because of their status as Indians," 25 U.S.C. § 450f(a)(1)(E), I would resolve this ambiguity by first looking to the statute's legislative history, which reflects Congress's clear desire to expand Indian autonomy and self-government in administering federal programs. *See Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. 2778 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").

The 1974 House Report accompanying the passage of the Indian Self Determination Act ("Act") described its fundamental

purpose as follows: "to promote maximum Indian participation in the government and education of the Indian people; [and] to provide for the full participation of Indian tribes in programs and services conducted by the Federal Government for Indians and to encourage the development of the human resources of the Indian people...." H.R.Rep. No. 93–1600, at 1 (1974), *reprinted in* 1974 U.S.S.C.A.N. 7775–76. Similarly, the Senate Report accompanying passage of the 1988 amendments to the Act described their purpose as follows: "The amendments ... are intended to increase tribal participation in the management of Federal Indian programs and to help ensure the long-term financial stability for tribally-run programs. The amendments are intended to remove many of the administrative and practical barriers that seem to persist under the Indian Self Determination Act." S.Rep. No. 100–274, at 2 (1987), *reprinted in* 1988 U.S.S.C.A.N. 2620–21. The Senate Report quoted from President Nixon's description of the original Act's fundamental purpose as follows:

> For years we have talked about encouraging Indians to exercise greater self-determination, but our progress has never been commensurate with our promises .... [W]hen a decision is made as to whether a Federal program will be turned over to Indian administration, it is the Federal authorities and not the Indian people who finally make that decision. *This situation should be reversed. In my judgment, it should be up to the Indian tribe to determine whether it is willing to assume administrative responsibility for a service program which is presently administered by a Federal agency.*

S.Rep. No. 100–274, at 2–3 (1987) (citation omitted) (emphasis added).

In *Ramah Navajo Chapter*, the Tenth Circuit followed Congress's intended rationale in reversing summary judgment against the Chapter's claims against the Secretary of the Interior for violation of the funding provisions of the Indian Self–Determination and Education Assistance Act ("ISDEAA"). The Tenth Circuit ruled that "the canon of construction favoring Native Americans control[led] over the more general rule of deference to agency interpretations of ambiguous statutes" because the court believed that "it would be entirely inconsistent with the purposes of the Act, as well as with the federal policy of Native American self-determination in general, to allow the canon favoring Native American self-determination in general, to allow the canon favoring Native Americans to be trumped." 112 F.3d at 1462.

The majority opinion completely ignores the ISDEAA's overarching purpose to bolster Native American self-determination by transferring control over the "planning, conduct and administration" of federal programs and services. 25 U.S.C. § 450a. In this light, the special provisions of the Temporary Assistance to Needy Families ("TANF") program that treat Native Americans preferentially, *see* 42 U.S.C. § 612 (establishing a completely separate and comprehensive scheme for the funding and administration of TANF benefits for Indian tribes, including an exemption from the time limits and work participation requirements generally applicable to state recipients), leave no doubt about congressional intent in this case: that TANF satisfies the ISDEAA's requirements for a self-determination contract, since it provides benefits to Indians "because of their status as Indians."

Conversely, the limiting construction proposed by the Secretary plainly contravenes congressional intent. Given that the purpose of the ISDEAA is to promote

Native American self determination, the Secretary can offer no reasonable explanation why the universe of programs that are subject to self-determination contracts should be limited to only those that "particularly" or "exclusively" benefit Native Americans. The majority opinion likewise fails to address this point.

In striking down a similarly restrictive interpretation of the ISDEAA's indirect cost funding provisions, *see* 25 U.S.C. § 450j–1, put forth by the Secretary of Interior, the Tenth Circuit found the government's position "unreasonable" because it "d[id] nothing to assure maximum participation by Indian tribes in the planning and administration of federal services, programs and activities for Indian communities," or to "[enhance] the development and perception of Indian tribes as self-government entities." *Ramah Navajo Nation,* 112 F.3d at 1462 (*quoting* S.Rep. No. 100–274, at 1–2 (1987)). Like the Tenth Circuit, I find the HHS Secretary's restrictive construction of the ISDEAA in this case to violate congressional intent. The Secretary's refusal of ISDEAA coverage for TANF funding has effectively denied the Navajo Nation its self-determination rights under the Act, by preventing the Navajo from obtaining supplemental funding to administer TANF under their sovereign authority. I would hold that the Secretary's interpretation should be overruled and that the TANF provisions at issue in this case satisfy the requirements of a self-determination contract under the ISDEAA.

